AO 106A  (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
## for the
### District of New Mexico

FILED
UNITED STATES DISTRICT COURT
LAS CRUCES, NEW MEXICO

APR 07 2026

MITCHELL R. ELFERS
CLERK OF COURT

26-690 MR

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Appurtenant Structures and Grounds Located at 7155 Hwy 12, Datil, NM 87821 ("PROPERTY 1"); and 7154 and 7156 Hwy 12, Datil, NM 87821 ("PROPERTY 2")

)
)
)
)
)
)
)

Case No.

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A (A1-A2), which is attached and fully incorporated herein.

located in the _____ District of _____New Mexico_____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, which is attached and fully incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 16 U.S.C. §§ 1538 and 3372-73 | Endangered Species Act; Lacey Act |

The application is based on these facts:
See Attachment C, which is attached and fully incorporated herein.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

ADRIENNE RUIZ BELIDA          Digitally signed by ADRIENNE RUIZ BELIDA
                              Date: 2026.04.07 14:39:48 -06'00'
_____
*Applicant's signature*

Adrienne Ruiz Belida, Special Agent, Fish & Wildlife
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____Telephone_____ *(specify reliable electronic means).*

Date:  _____04/07/2026_____

_____
*Judge's signature*

City and state:  Las Cruces, New Mexico

Jerry H. Ritter, United States Magistrate Judge
_____
*Printed name and title*

## ATTACHMENT A-1

*Property to be searched*

## PROPERTY 1

The property to be searched is located at 7155 Highway 12, Datil, NM 87821, and consists

of approximately three acres owned by Wacey and Kaci Walraven and includes one primary residential home, a carport, and the surrounding grounds, including the exterior  of the residence, the carport, and any vehicles matching the following description located on the property: a Gray Toyota Tacoma with a black metal Grille guard, NM: RBW253 or any UTV/ATV or 4x4 tractor vehicles with chevron pattern tire tread.

The search of Property 1 shall include all appurtenant structures, including attached and detached garages, any storage areas or containers, and the grounds on the property, but shall not include the residential home located on Property 1. Property 1 is designated by a green circle on the accompanying map.

## ATTACHMENT A-2

*Property to be searched*

### PROPERTY 2

The property to be searched is located at 7154 and 7156 Highway 12, Datil, NM 87821, and is limited to two separate portions of land, within a private land parcel, owned by Russell and Melynda Walraven and includes at least two primary residential homes listed as 7154 and 7156, and several appurtenant structures, the largest baring a distinct sign displaying "WALRAVEN





HORSES, BREAKING TRAINING." County assessor's records list both 7154 and 7156 as the address under the property parcel record.

The search of the above Property 2 shall include all appurtenant structures, attached and unattached garages and storage areas/containers on Property 2, and any vehicles matching the

2

## ATTACHMENT A-2 CONTINUED

following description located on the property: a Gray Toyota Tacoma with a black metal Grille guard, NM: RBW253 or any UTV/ATV or 4x4 tractor vehicles with chevron pattern tire tread.

The search of Property 2 also includes the open field area in and around 34.12321, -107.88707. The search of Property 2 shall not include the two residential homes located on Property 2. Property 2 is designated by two red circles on the accompanying map.



3

## ATTACHMENT B

### PARTICULAR THINGS TO BE SEIZED/INFORMATION TO BE RETRIEVED

All evidence of violations 16 U.S.C. §1538 (the Endangered Species Act) and 16 U.S.C. §§ 3372-3373 (the Lacey Act), including the following items:

1. Any wildlife, in part or whole, that can be identified as fruits, evidence, and instrumentalities of violations of the Endangered Species Act 16 U.S.C. §1538.

2. Any rounds of the following caliber or firearms capable of shooting the following rounds: 218 Bee, 219 Zipper, 22 Hornet, 22 Remington Jet, 22WMR, 22-250 Remington, 220 Swift, 221 Remington Fireball, 222 Remington Mag, 222 Remington, 223 Remington/5.56 x 45mm NATO, that can be identified as fruits, evidence, and instrumentalities of violations of the ESA 16 U.S.C. §1538 and Lacey Act (16 U.S.C. § 3372).

3. Any foothold traps or cable device, any trap bags and trapping related tools to include; trap identification tags, trapper id number, drivers, sifter, hammer, bait urine, visual attractants.

4. Any and all clothing consistent with those identified in warrant.

5. Tire impressions from any UTV/ATV or 4x4 tractor vehicles with chevron pattern tire tread.

6. Messages, notes, correspondence, and/or communications regarding Mexican Grey Wolves between the Walravens and/or Wellborn regarding wolves and/or trapping activity.

7. Indications of ownership or control over Gray Toyota Tacoma with a black metal Grille guard, NM: RBW253 or any UTV/ATV style vehicles with chevron pattern tire tread located at the place to be searched, including but not limited to, titles, registrations, gas receipts or repair bills belonging to that vehicle.

8. Photographs and/or videos of co-conspirators, assets, and /or protected wildlife, stored in any form including electronic form.

4

## ATTACHMENT C

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Adrienne Ruiz Belida, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      Affiant makes this Affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the property known as:

   a. 7155 Highway 12, Datil NM, 87821 ("PROPERTY 1"), further described in Attachment A-1

   b. 7154 and 7156 Highway 12, Datil NM, 87821 ("PROPERTY 2"), further described in Attachment A-2;

for the things described in Attachment B.

2.      I am a Special Agent employed with the United States Fish and Wildlife Service ("FWS"), Office of Law Enforcement, in Albuquerque, New Mexico.  I am thus an "investigative or law enforcement officer" of the United States within the meaning of Section 16 U.S.C. § 3375 and Federal Rule of Criminal Procedure 41(a), authorized to investigate violations of laws of the United States and execute warrants issued under the authority of the United States.

3.      I have been employed by the FWS as a Special Agent for nine years.  Prior to my employment as a Special Agent with the FWS, I served as a law enforcement officer for the National Park Service for approximately eight years.

4. I have received specialized training and possess experience in the enforcement of federal laws, including the Endangered Species Act ("ESA"), 16 U.S.C. § 1531, *et seq.* and the Lacey Act, 16 U.S.C. § 3371, *et seq.* I have participated in numerous federal investigations, either as a case agent/officer or in various support roles, including investigations involving the unlawful take, possession, purchase, sale, shipment, and transport of endangered species and other wildlife. I have also participated in the service of arrest and search warrants.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers, and witnesses.

6. In addition, I have developed information Affiant believes to be reliable from additional sources including

    a. Information provided by Special Agents ("SA"), and Intelligence Research Specialists (IRS) of the FWS, and other law enforcement officials ("agents"), including oral and written reports that I have received directly or indirectly from said investigators;

    b. Results of physical surveillance conducted by agents during the investigation;

    c. A review of public records and driver's license and automobile registration records;

    d. Records from commercial databases; and

    e. Records from the National Crime Information Center ("NCIC").

7. This affidavit is intended to show only that there is sufficient probable cause for the

2

requested warrant and does not set forth all of my knowledge about this matter.

## THE RELEVANT STATUTES

8.    The Endangered Species Act was congressionally enacted to provide a program for the conservation of endangered and threatened species.  Under the ESA regulation, the terms "endangered species" or "threatened species" include any species, or part thereof, included on the "List of Endangered or Threatened Wildlife," found in Title 50 Code of Federal Regulations ("C.F.R.") Part 17.11.

9.    "Experimental Population" means an introduced and/or designated population (including any offspring arising solely therefrom) that has been so designated in accordance with the procedures of this subpart but only when, and at such times as, the population is wholly separate geographically from nonexperimental populations of the same species.

10.    Any population determined by the Secretary of the Department of the Interior to be an experimental population will be treated as if it were listed as a threatened species for purposes of establishing protective regulations under section 4(d) of the Act with respect to such population. The species-specific rules (protective regulations) adopted for an experimental population under 50 C.F.R Part 17.81 will contain applicable prohibitions, as appropriate, and exceptions for that population.

11.    Pursuant to 16 U.S.C. §§ 1538(a)(1)(B), and 1540(b), the ESA makes it unlawful for any person to take any listed species within the United States. 16 U.S.C. § 1532(19) defines "take" as harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect or to attempt to

3

engage in any such conduct.

12.    The Mexican gray wolf (*Canis lupus baileyi*) are listed as "endangered" under 50 C.F.R. 17.11, wherever found, except where included in an experimental population as set for in 50 C.F.R. 17.84(k).  See Federal Register ("FR") Notice 41 FR 24062. Mexican gray wolf (*Canis lupus baileyi*) are listed as "threatened" under 50 C.F.R. 17.11 within the Mexican Wolf Experimental Population Area (MWEPA*)*, being an area in Arizona and New Mexico including Zones 1, 2, and 3, as defined 50 C.F.R.17.84 (k)(3), that lies south of Interstate Highway 40 to the international border with Mexico.

13.    Pursuant to 50 C.F.R. 17.84 (k)(5)(i) no person may possess, sell, deliver, carry, transport, ship, import, or export by any means whatsoever any Mexican wolf or wolf part from the experimental population except as authorized in this rule or by a valid permit issued by the Service under § 17.32. If a person kills or injures a Mexican wolf or finds a dead or injured wolf or wolf parts, the person must not disturb them (unless instructed to do so by the Service or a designated agency), must minimize disturbance of the area around them, and must report the incident to the Service's Mexican Wolf Recovery Coordinator or a designated agency of the Service within 24 hours as described in paragraph (k)(6) of this section. 16 U.S.C. §§ 1538(a)(1)(B). Further, per 50 C.F.R 17.84 (k)(5)(iii) Taking a Mexican wolf with a trap, snare or other type of capture device within occupied Mexican wolf range is prohibited and will not be considered unintentional take, unless due care was exercised to avoid injury or death to a wolf.

14.    Pursuant to 50 C.F.R. 17.84 (k)(5)(iii), due care, with respect to trapping activities, includes following the regulations, proclamations, recommendations, guidelines, and/or laws

4

within the State or tribal trust lands where the trapping takes place and reporting the capture of a Mexican wolf (even if the wolf has pulled free) within 24 hours to the FWS, as described in 50 C.F.R. 17.84(k)(6). If a Mexican wolf is captured, trappers can call the Interagency Field Team (1-888-459-WOLF [9653]) as soon as possible to arrange for radio-collaring and releasing of the wolf. Pursuant to state regulations for releasing nontarget animals, trappers may also choose to release the animal alive and subsequently contact the FWS or Interagency Field Team.

15.     Pursuant to 16 U.S.C. § 3372(a)(1), the Lacey Act makes it unlawful for a person to import, export, transport, sell, receive, acquire, or purchase any fish or wildlife, taken, possessed, transported, or sold in violation of any law, treat or regulation of the United States or in violation of any Indian tribal law.

16.     Per the definitions of the Lacey Act, "taken" means captured, killed, or collected. the term "transport" means to move, convey, carry, or ship by any means.

## PROBABLE CAUSE

### Wolf No. 2704

17.     On May 9, 2025, the Mexican Gray Wolf Recovery Program (MGWRP) received a mortality alert from the GPS collar of Mexican gray wolf #2704 ("Wolf #2704) at GPS coordinates 34.09250, -107.883962, located east of Highway 12, south of Datil, New Mexico. MGWRP monitors wolf populations using GPS collars, which trigger a mortality signal after four hours of no movement, an uncommon duration for a healthy wolf.

18.     That same day, technicians used radio telemetry to locate the signal and confirmed a mortality alert. The coordinates were relayed to New Mexico Department of Game and Fish CPL

5

Wright to request access. Initially believing to be on private property owned by the Walraven family, CPL Wright made multiple attempts to contact Russell Walraven's ("R. Walraven") son, Wacey Walraven ("W. Walraven"), but received no response. Agents then learned that the land from which the mortality signal was coming is owned by Henry Dick Wellborn, who is W. Walraven's grandfather, and is approximately two miles away from W. Walraven's residence, Property 1, and borders a section of Property 2.

19. An MGWRP wildlife biologist analyzed the cluster of GPS points at the mortality site (a cluster of GPS points is a group of closely spaced coordinates that indicate a significant activity area). The data covered the period from May 7 through May 9, 2025. Based on this analysis, the biologist determined that it would be unusual for a wolf to remain in one location for that length of time unless it was feeding on a kill or caught in a trap.

20. Several days later, on May 12, 2025, a new GPS signal was received. The location was on a public highway about one mile from the initial cluster. Special Agent Snodgrass responded to the site and discovered the carcass of Wolf #2704 at GPS coordinates: (34.091069, -107.901853).

6



21.    Upon examining the carcass, SA Snodgrass observed swelling and a parallel injury on the left front paw, consistent with a leg-hold trap. A leg-hold, or restraining trap, is commonly used for foxes, coyotes, wolves, and bobcats. It consists of a metal foot plate and spring-loaded jaws, typically set in high-traffic or baited areas and anchored to the ground or a tree. Once triggered, it immobilizes the animal and usually requires human intervention for release. Based on the decomposition/bloating of the carcass, SA Snodgrass believed Wolf #2704 had been dead for multiple days. SA Snodgrass searched the highway and area surrounding Wolf #2704 and found no signs that the wolf was struck by a vehicle or any signs of trapping in the immediate area. SA Snodgrass secured the carcass as evidence and placed it in evidence freezer later the same day.

22.    Utilizing the Open Fields Doctrine which allows law enforcement to enter undeveloped land outside the immediate area of a home, SA Snodgrass walked about a mile to the original mortality site on Wellborn's property.

23.    At the initial mortality site, SA Snodgrass located and documented a buried leg-hold trap at 34.0925527, -107.8838416, the same area of Wolf #2704's first mortality signal. The

7

trap had what appeared to be a pan screen coffee filter with blood on the paper and was set beside three rocks, which SA Snodgrass identified as a possible scent lure setup. SA Snodgrass swabbed the trap and collected a portion of the paper screen for DNA and genetic testing.

 

24.    The next day, on May 13, 2025, SA Snodgrass and your Affiant returned to the original site on Wellborn's property which borders a portion of Property 2 and placed trail cameras to monitor the trap.

25.    Footage from May 14, 2025, showed a male wearing a camouflage jacket arriving in a gray truck consistent with a Toyota Tacoma. The vehicle had a black grille guard and a turquoise New Mexico license plate. Photos show the individual utilizing a shovel to dig up and remove what appears to be the trap located by SA Snodgrass. Further investigation of state vehicle records identified R. Walraven and W. Walraven as the registered owners of a gray 2020 Toyota Tacoma with a turquoise centennial plate with an address of is 7155 Highway 12, Datil, NM 87821

8

(Property 1). Additionally, agents inspected New Mexico hunting/trapping licenses records which showed W. Walraven possessed a trapping license for 2024.





26.    Affiant obtained driver's license records and photos of Wacey Walraven, Russell Walraven and Henry Dick Wellborn.  This provided identifying markers for the subjects. The information listed as personal identifiers are listed as follows: Wacey Jay Walraven, 40-year-old, White/Male, 5'9", 160 lbs, brown eyes, brown hair. Russell Jay Walraven, 66-year-old, White/Male, 5'4", 130 lbs, Brown eyes, Gray hair, and Henry Dick Wellborn, 87 year old, White/Male, 5'6", 150 lbs, Brown eyes, Gray hair.

9



PLOTWATCHER PRO FWS LE     05/14/2025 19:17:21 100% 51F



PLOTWATCHER PRO FWS LE     05/14/2025 19:18:24 100% 50F

10

27.     The subsequent necropsy of Wolf #2704 found both acute and chronic trap injuries. The left front foot showed tearing, swelling, and hemorrhage consistent with a recent leg-hold trap injury.

28.     Although decomposition limited some findings, the stomach and intestines were empty except for sticks, hair, and evergreen material, indicating prolonged lack of food. Adequate fat stores suggested the wolf had been without food for at least 24 hours.

29.     No fractures or gunshot wounds were found. As such, Affiant submits that the most likely cause of death was entrapment leading to dehydration. Decomposition indicated the wolf had been dead for a week or more before freezing.

30.     Additionally, DNA analysis of samples collected from the paper accompanying the trap confirmed the presence of Mexican gray wolf (Canis lupus baileyi) or a hybrid on multiple samples.

31.     Based on my training, experience, and the evidence collected, Affiant believes Wolf #2704 was caught in the leg-hold trap on Wellborn's property, (which is adjacent to Property 2 and in close proximity to Property 1) as wolf DNA was found on the suspected pan screen located in the trap. The trap also appears to be maintained by the Walraven's, as their truck was observed being used on location when surveillance observed the trap being dug up. Additionally, W. Walraven is known to be familiar with traps, having recently held a trapping permit. I further believe the wolf died while trapped and based on this investigation, was intentionally moved about one mile to a public highway to potentially conceal both the trap and the carcass. Based on this information, the trapping of Wolf #2704 was prohibited under 50 C.F.R. 17.84 (k)(5)(iii) due care

11

standard and the possession and movement of the carcass would be in violation of 50 C.F.R. 17.84 (k)(5)(i).

### Wolf No. 2994

32.    On June 4, 2025, at approximately 3:00 a.m., the GPS collar of Mexican gray wolf #2994 ("Wolf #2994") transmitted a routine location signal, placing the wolf at 34.123208, -107.887078 coordinate location southwest of Datil, NM, on the private property of R. Walraven (Property 2). Later that day, a mortality signal was received from approximately the same location. Based on these two signals originating from the same location within a 12-hour period, an unusual occurrence, MGWRP biologists believed Wolf #2994 may have been caught in a trap, and agents were notified.

33.    On June 5, 2025, in the early afternoon, Affiant and CPL Wright traveled to the mortality signal located on Property 2. Upon arrival, we observed a primary residential dwelling along with several appurtenant structures located nearby. According to assessor's records, a large portion of the property is owned by R. Walraven however the primary residence and a few acres around the residence are owed by W. Walraven. The primary residence and appurtenant structures are situated approximately 655 yards northeast of the mortality signal location. Additionally, a primarily east to west two-track road runs from the main residential driveway and appears to end just east of the mortality point location.

34.    At the residence, CPL Wright and Affiant made contact with a female later identified as Kelsi Walraven, W. Walraven's wife. We introduced ourselves by name, title, and agency, and displayed our official credentials. I explained that a mortality signal had been received

12

from a wolf collar on the property and requested permission to access the location. Kelsi stated that permission would need to be granted by her husband, W. Walraven. CPL Wirght had a contact number for W. Walraven and confirmed it with Kelsi as 505-977-1808 (Commercial database records indicate this number is registered to W. Walraven and serviced by Cellco Partnership d/b/a Verizon Wireless). Kelsi further stated that W. Walraven was out watering cattle and would likely be out all day. She added that they regularly ride in that area but had not observed any wolves.

35.    After leaving the property, CPL Wright contacted W. Walraven and explained the request to access the location. W. Walraven stated that his father, R. Walraven, owns the property and that agents would need to contact R. Walraven directly at 505-977-1809 for permission. W. Walraven further explained that he owns only a few acres surrounding the residence (Property 1), which is consistent with public property records showing a limited parcel around the home. Additionally, Catron County Assessor records list W. Walraven and Kelsi Walraven as the registered owners of the residence.

36.    The Affiant called R. Walraven's phone number, which was confirmed by voicemail to belong to him, but received no answer or return call. Agents note that R. Walraven's primary residence is located at 7154 Highway 12, Datil NM, 87821, directly across the highway from Property 1, although his large acreage of property extends across both sides of the highway.

37.    For purposes of this warrant, agents have limited the area identified as Property 2 to two smaller portions. Accordingly, Property 2 consists of a portion of land containing multiple outbuildings, vehicles, and trailers that appears to serve as the primary location for ranching equipment, as well as a separate portion of land on the opposite side of the highway where the

13

mortality signal was identified.



39.    CPL Wright ran into W. Walraven later that day with his grandfather, Wellborn, owner of the adject property. They spoke briefly, during which time, W. Walraven told CPL Wright that his father would not be giving permission to access the property. W. Walraven also stated that he rides back in that area of the property all the time and there were no wolves back there.

40.    On June 7, 2025, agents received backdated GPS data points for Wolf #2994 spanning from June 5 at approximately 5:00 a.m. through the morning of June 7. This data was received with delay, as GPS collar transmissions are not always immediate and may be delivered in clusters due to variability in satellite signal transmission. Upon review, agents determined that Wolf #2994 had moved to a new location within the National Forest, approximately one mile from the original mortality signal location. Agents further learned that this area of the National Forest is permitted for R. Walraven's use for cattle grazing.

41.    That same day around 5:00 p.m., CPL Wright CP and Affiant subsequently traveled

14

to the location and observed tracks consistent with a UTV, which led to the discovery of Wolf #2994's carcass. Upon examination, CP determined that the tire tracks had a distinct chevron-type

pattern. Following the tracks, it appeared the suspected UTV traveled up a hillside to a flat area near a small ravine, then backed out and exited the area. Additionally, ground disturbance was observed in the ravine between the tire tracks and the carcass, indicating that someone may have recently been in the area.



42.    The carcass of Wolf #2994 was lying on its left side with its head facing to the south, southwest. The GPS collar was intact on the neck. The tip of the left ear was folded back,

while the tip of the right ear was folded to the front, both with a leftward slant. Based on Affiant's training and experience, I know the post death phase of rigor mortis often causes body parts to hold positions where pressure has been applied for longer periods of time. This led me to believe that Wolf #2994 likely spent some time, postmortem, in a different position. Additionally, based on the state of decomposition, Affiant believes the carcass of Wolf #2994 to be a few days old. The carcass had been partially scavenged.



15

The front right paw was enlarged and had a parallel injury on the front and rear of the upper paw, consistent with a leg-hold trap injury.

43.    No leghold traps were found in the immediate area, and there were no other obvious signs of injury on the carcass. This led me to conclude that the wolf had not been trapped at that location and likely died elsewhere in a different position.



44.    After securing the carcass, CP and Affiant followed the tire tracks as they descended the hillside, rejoined a Forest Service road, and continued through the National Forest for over half a mile until reaching a gated fence line separating the National Forest from State of New Mexico land. At the gate, I observed a boot print alongside the tire tracks.

45.    The tire tracks continued off road through the State of New Mexico land for a little less than a mile before going through another gate onto R. Walraven's property. CPL Wright and I continued following the tracks which were heading in a southeastern direction toward the residence of W. Walraven. We followed the tracks for approximately 125 yards onto the property.

16

Upon looking at the map, I noted that if the tire tracks continued straight, which they appeared to be doing, they would intersect with the two-track road running east to west between W. Walreavens' driveway located on Property 1 and Wolf #2994's original mortality point located on Property 2.

46. From that point, CPL Wright and I walked across a rocky hill to the original mortality point location of 34.123208, -107.887078. At the location, we observed the area appeared to be a dumping location for carcasses. I observed the carcasses of a full adult cow and a calf in the area, along with a variety of bones scattered throughout[1]. The area appeared to be heavily trafficked with a lot of ground disturbance. CPL Wright and I quickly looked around the area for obvious signs of leghold traps, but did not locate any. Though there were no roads, I did locate and document tracks matching the tire tracks chevron pattern, approximately 14 yards from the mortality point location.

47. Based on Affiant's training, experience, and the evidence collected, I believe Wolf #2994 was moved from the original mortality location of 34.123206, -107.887071 on the Walraven property to the Cibola National Forest location of 34.141026, -107.895566, sometime between June 4, 2025, at 3:00 p.m. (MDT)., and June 5, 2025, at 5:00 a.m. (MDT). CPL Wright and I contacted the Walravens during the afternoon of June 5, 2025, and attempted to locate the collar in the area during the same time frame. However, at that time, Wolf #2994's carcass had likely already been moved. I further believe that a UTV-type vehicle with chevron-patterned tires was

---

[1] A form of bait is often used to attract predators in trapping. Animal carcasses are a form of bait.

17

used to transport the carcass from the original mortality site to a location approximately one mile away, which served as the dumping site within the National Forest.



*Reflected above is a snapshot showing Wolf #2994's original GPS mortality location marked with the red pin at the bottom of the satellite image, along with the location where Wolf #2994's carcass was recovered. This point is marked with the red point with a wolf graphic at the top of the image. The blue dashed line is the track marking the route of the Tire Tracks to the point SAs cut off to go directly to the mortality site. Property 1 is visible in the lower right of the screen, surrounded by the red box, Property 2 is directly across the street.*

48.    Additionally, Affiant obtained cell tower data from Verizon Wireless and AT&T for calls made between 3:00 p.m. and 5:00 a.m. on June 4 through June 5, 2025, near the GPS locations corresponding to the initial mortality site, Wolf #2994's carcass recovery site, and various points along the tire track route. The Verizon data identified two calls of interest showing

18

that W. Walraven's phone number contacted his grandfather Wellborn's number during the timeframe when agents believe the carcass may have been moved, indicating that W. Walraven's cellphone was in the area at that time. The cell phone tower information is listed below:

    a.   June 4, 2025, at 22:41:01 for 15 seconds from Wacey Walraven's phone number of 505-977-1808 to phone number 575-418-7889[2], belonging to Wellborn.

    b.   June 4, 2025, at 22:41:20 for 20 seconds from Wacey Walraven's phone number of 505-977-1808 to phone number 575-418-7889, belonging to Wellborn.

49.     On or around August 8, 2025, Affiant drove by the Walraven residences, from the roadway, and observed what appeared to be a UTV type vehicle, with a camouflage roof at Property 2.

50.     On September 11, 2025, Affiant drove by the residence again and noted the Gray Toyota Tacoma with a black metal Grille guard, NM: RBW253 parked at Property 2.

51.     On October 2, 2025, SA Snodgrass checked the residences and noted the same Gray Toyota Tacoma with a black metal Grille guard, NM: RBW253 parked at Property 2.

52.     October 4, 2025, CPL Wright checked the residences and observed the same Gray Toyota Tacoma with a black metal Grille guard, NM: RBW253 parked at Property 1. On November 14, 2025, I checked the residences and noted the same Gray Toyota Tacoma with a black metal Grille guard, NM:RBW253, parked at Property 1.

53.     On October 23, 2025, a video titled Ranch life inside the "Wolf Experimental

---

[2] Commercial data base records indicate this is a number is registered to Henry Dick WELLBORN and is service by Cellco Partnership dba: Verizon Wireless.

19

Population Area" was posted on the "Wolves Among Us" Instagram page[3]. The video featured an interview with Melynda Walraven which included a video featuring Melynda Walraven and R. Walraven riding in a UTV at what appears to be their residence. A John Deere symbol was visible on the front of the UTV and "855 D" was visible over the wheel well of the front passenger side tire, a likely indication of the UTV make and model. The tires on the UTV have a similar solid chevron tread to the Tire Track. The UTV also had a camouflage-colored top, similar to the one observed at Property 2.



54.    A subsequent necropsy report from the National Fish and Wildlife Forensics Laboratory for Wolf #2994 concluded that the animal had a paw injury that was both chronic and acute, as evidenced by bone proliferation, as well as swelling and hemorrhaging occurring minutes to hours before death. The injury was most likely caused by trap trauma, though this could not be determined definitively.

---

[3] https://www.instagram.com/reel/DQK7RCigduz/

20

55.    Wolf #2994 had two injuries with the severity to have been rapidly to immediately fatal. A gunshot wound impacting its neck and blunt force trauma to the head. The examiner suspected that the gunshot rendered the wolf immobile from damage to the cervical spine (proximate cause of death). The wolf was then dispatched with a blow to the head (immediate cause of death).



*Figure 3: A 3-D reconstruction of the CT scan of LAB-1. There is a large piece of metal at the base of the neck on the left side (arrow). The right front foot has a chronic injury to the bones of the toes with fragmentation to partial loss of the bones (yellow circle).*

21



*Figure 1b: A 3-D reconstruction of the CT scan of LAB-1. There are fractures across the frontal region of the skull and extending down the nose. Fractures radiate from the front and right side.*

56.     A bullet fragment was retrieved from the carcass, weighing 36.2 grains with apparent loss. The bullet may most likely be consistent with a jacketed varmint bullet of at least approximately 40 grains. The caliber of the bullet fragment was determined to be of nominal .22 caliber, which includes the following calibers of bullets which exhibit copper jacketed lead core bullets: 218 Bee, 219 Zipper, 22 Hornet, 22 Remington Jet, 22WMR, 22-250 Remington, 220 Swift, 221 Remington Fireball, 222 Remington Mag, 222 Remington, 223 Remington/5.56 x 45mm NATO (most likely, most common round). Further examination revealed that the bullet fragment may have some possible value for identification should a possible source be submitted for comparison. Accordingly, the Affiant believes that Wolf #2994 was trapped, shot, struck on the head, and then moved to a different location.

57.     Further investigation revealed that pursuant to New Mexico business records, the Wellborn and Walraven families work together in the management of their livestock businesses. As such Affiant submits that they have vested interest in associated predator control.

58.     Additionally, agents request authorization to conduct brief drone observations from

22

lawful public vantage points immediately prior to entering the properties. The purpose of these observations is to enhance officer safety and to determine whether the vehicles described in this warrant (Gray Toyota Tacoma with a black metal Grille guard, NM:RBW253 and a UTV with camouflage roof) are present at Property 1 and Property 2. The requested surveillance will consist of high-altitude, non-persistent observation and will not employ any technology-enhanced imaging capabilities.

## CONCLUSION

59.    Based on the foregoing, there is probable cause to believe that the crime of unreported take and transport of a threatened species, in violation of 16 U.S.C. §1538 (the ESA) and 16 U.S.C. §§ 3372-3373 (the Lacey Act) as occurred.

60.    I submit that this affidavit supports probable cause for a warrant to search the Properties described in Attachments A-1 and A-2, and seize the items described in Attachment B.

Respectfully submitted,

ADRIENNE RUIZ BELIDA   Digitally signed by ADRIENNE RUIZ BELIDA
Date: 2026.04.07 14:39:17 -06'00'

Adrienne Ruiz Belida
Special Agent
Office of Law Enforcement
United States Fish and Wildlife Service

Electronically signed and telephonically sworn on April ___7___, 2026.

HONORABLE JERRY H. RITTER
UNITED STATES MAGISTRATE JUDGE

23